New Jersey Department of Labor,
Workmen's Compensation Bureau.

HAROLD SIMPKINS, PETITIONER, v. MARTIN DYE AND FINISHING CO., RESPONDENT.

Decided February 11, 1944

For the petitioner, *Rothbard, Greenstone & Harris* (*Louis H. Roth,* appearing).

For the respondent, *John W. Taylor* (*Arthur J. Blake,* appearing).

A petition was filed in the above entitled cause seeking compensation under the provisions of the Workmen's Compensation Act of this state, *R. S.* 34:15–1, *et seq.; N. J. S. A.* 34:15–1, *et seq.*, and an answer having been duly filed by the respondent, the matter came on for hearing before me, a Deputy Commissioner of Compensation, at Camden, New Jersey.

It was stipulated that the petitioner sustained an accident on May 9th, 1941, resulting in injuries which arose out of, during and in the course of his employment, and that respondent had due notice and knowledge of the occurrence of said injuries; that respondent paid temporary disability to the petitioner at the rate of $20 per week for a period of 67 3/7 weeks from May 9th, 1941, the date of said accident, to August 23d, 1942, inclusive.

It was further stipulated that respondent was making payments on account of partial permanent disability to the extent of 80% of total, but that such payments were being made at the compensation rate of $11.29 per week, it being contended by the respondent that this latter amount is the correct compensation rate, and that the respondent is entitled to a credit on the permanent disability payments of the overpayment made on the temporary disability.

It appears that the petitioner was engaged in running cloth through mechanically-operated rollers, and while attempting to straighten out the edges of the cloth, his hands became caught in and both arms were drawn between the rollers. The action of the rollers literally tore the flesh from both arms to a point almost to the shoulders. A long period of hospitalization followed during which extensive skin graftings were performed, but the mangled and destroyed musculature, nerves and tendons could not be replaced, nor their functions restored. The petitioner offered himself as an exhibit. The deformities of both arms, which are practically covered with deep, discolored and adherent scarring, are obvious. There is no serious controversy as to the physical injuries, but only as to the extent of the disability resulting therefrom.

It appears from the medical testimony that the petitioner's

right elbow is definitely fixed at about 120 degrees, with no extension or flexion possible; that rotation of his right forearm is only 50% of normal; that he has partial ankylosis of the right index finger and little muscular power in the hand. The extent of function of petitioner's right arm is stated in the report of Dr. Robert S. Gamon, offered on behalf of the respondent, to be "useful in feeding or helping with his clothing." It also appears from the testimony that petitioner has a flexion deformity of the left elbow, with only 20 degrees range of motion to a right angle, and has only partial movement of wrist and fingers.

The petitioner testified that he can raise his right arm to shoulder height only and his left to a point just above shoulder height; that he cannot undress, tie his shoes or necktie, take a bath or attend to duties of nature without assistance. He further stated he has not much strength in his arms and a little sweeping around the house tires his arms out.

The orthopedic disability was stated to be 80% of total by Dr. Gamon, 75% of total by Dr. Millard F. Sewall, the attending surgeon, both appearing on behalf of the respondent, and 100% by Dr. Henry L. Drezner, appearing on behalf of the petitioner.

The petitioner further testified that his left arm swells and he has not had much feeling in either arm and that they ache and pain; that he is nervous and cannot sleep, and gets frequent headaches. His wife testified that he is restless and irritable, and on many occasions has become so nervous in the middle of the night that he has gone out for walks; that he does not like to meet people, is jealous, swears furiously, kicks at his son, acts over-sexed and sits and talks to himself and at times "just sits and grins."

Dr. Samuel Hirschberg, a neurologist, appearing on behalf of the petitioner, testified that petitioner suffered personality changes, and because of the destruction of nerves of the upper extremities has marked anaesthesia in the right arm and complete anaesthesia in the left arm, and it was his opinion that the petitioner suffered a minimum of 20% partial permanent disability neurologically. It was the opinion of Dr. Jack Blumberg, a neurologist, appearing on behalf of the respondent, that the petitioner suffered 7½% to 10% partial

permanent disability by reason of a general hypesthesia on the left side.

It is my conclusion that the disability of the petitioner from the injuries sustained by him as the result of the accident on May 9th, 1941, arising out of, during and in the course of his employment with the respondent, and of which the respondent had due knowledge, is total in character and permanent in quality, and that the respondent had actual knowledge of the occurrence of said injuries.

The next question to be determined is the amount of temporary disability to which petitioner is entitled. It was stipulated that such disability payments were made for a period of 67 3/7 weeks, from May 9th, 1941, to and including August 23d, 1942.

The petitioner testified that the scabs of the skin grafting did not heal and he was treated by Dr. Sewall until December, 1942. However, on cross-examination he stated that the last treatment was given him by Dr. Sewall in October, 1942, but that he went back to the doctor afterwards for observation.

The petitioner further testified that in December, 1942, while putting on a sock, his right arm touched the stove in the kitchen of his home and that night when his shirt was taken off, he discovered a burn about the size of a half dollar on the interior surface of his right arm just below the elbow, and that his shirt sleeve was scorched over this spot; that he returned to Dr. Sewall who treated him until February, 1943, for this burn. This incident was corroborated by his wife, who stated she saw the burn, the scorched shirt and that Dr. Sewall treated the burn for about two months.

Dr. Sewall testified that he discharged the petitioner on August 27th, 1942, and although he did not have his records in court, remembered that the petitioner returned to him after that date because of abrasions probably occasioned by knocking the scar tissue which had become hardened, and that he may have treated him for that condition. He further testified that he treated the petitioner for a burn on the arm from January 2d, 1943, to January 21st, 1943, and rendered a bill for $15 for such treatment.

It is my conclusion that the abrading of the scar tissue on the left arm and the burn on the right arm were the result of innocent aggravations of the harmful effects of the original injury and the time required for the healing of the wounds constitutes a period of temporary disability for which petitioner is entitled to compensation. *Selak* v. *Murray Rubber Co.,* 8 *N. J. Mis. R.* 838; 152 *Atl. Rep.* 78; *affirmed,* 108 *N. J. L.* 548; 159 *Atl. Rep.* 93; *Flanagan* v. *Green,* 121 *N. J. L.* 327; 2 *Atl. Rep.* (*2d*) 180; *affirmed,* 122 *N. J. L.* 424; 5 *Atl. Rep.* (*2d*) 742; *Randolph* v. *Du Pont,* 130 *N. J. L.* 353; 33 *Atl. Rep.* (*2d*) 301. I, therefore, find that petitioner is entitled to temporary disability from May 9th, 1941, the date of the accident, to and including October 15th, 1942, and from January 2d, 1943, to and including January 21st, 1943, totaling 77 6/7 weeks.

The remaining question to be determined is the amount of the weekly wage upon which the compensation is to be computed. *R. S.* 34:15–37; *N. J. S. A.* 34:15–37, provides:

"'Wages,' when used in this chapter, shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident, and shall not include gratuities received from the employer or others. * * * Where the rate of wages is fixed by the hour, the daily wage shall be found by multiplying the hourly rate by the customary number of working hours constituting an ordinary day in the character of the work involved. In any case the weekly wage shall be found by multiplying the daily wage by five, or if the employee worked a greater proportion of the week regularly, then by five and one-half, six, six and one-half or seven, according to the customary number of working days constituting an ordinary week in the character of work involved. Five days shall constitute a minimum week."

The petitioner testified that at the time of hiring he was told that the plant worked on two 12 hour shifts, and that he was to work 12 hours per day 5 or 6 days per week, that his pay would be 37½ cents per hour for 8 hours per day, 40 hours per week, and overtime at 56¼ cents per hour for the time over 8 hours per day or 40 hours a week, and that in addition thereto he would receive a bonus. Mr. Le Roy

House, the cost clerk of the respondent, appearing on behalf of the petitioner, testified that the plant worked 24 hours a day in two 12 hour shifts, and that the customary work week was 12 hours per day, 5 days per week, and had been for several years prior to 1941; that the petitioner had worked 12 hours per day on each of the 56 days that he was employed by the respondent prior to the accident, and was paid at the rate of 37½ cents per hour for the first 8 hours per day and at the rate of 56¼ cents per hour for all time over 8 hours per day. He further testified that all employees, including the petitioner, in addition to the wages at the hourly rate, were paid a bonus of 10% of such wages, payable on a monthly basis.

The respondent contends that the compensation rate should be computed on a weekly wage of $15, based upon a 5 day week of 8 hours per day, or 40 hours, at 37½ cents per hour, plus a bonus of 10%. It urges, in support of this contention, that it is not customary for an employer to give an increased rate of pay for work done in the customary number of working hours per day, and that the rate of 56¼ cents per hour is for overtime hours and is to be excluded in determining the weekly wage for the purpose of computing the compensation rate under *Smolenski* v. *Eastern Coal Dock Co.*, 87 *N. J. L.* 26; 93 *Atl. Rep.* 85; *affirmed,* 88 *N. J. L.* 387; 95 *Atl. Rep.* 1079.

The original Compensation Act of 1911 contains no reference to overtime. The amendment of 1913 provided that in calculating the weekly wage in connection with piecework, overtime was to be excluded. In the 1919 amendment and all subsequent enactments the provision excluding overtime in connection with piecework has been omitted. Under the present statute, *R. S.* 34:15–37; *N. J. S. A.* 34:15–37, where the rate of wages is fixed by the hour, the daily wage is to be determined by multiplying the hourly rate (that is, the money rate at which the service rendered is recompensed under the contract of hiring) by the customary number of working hours constituting an ordinary day. In view of the legislative history of this wage provision, it is quite evident that the legislature was not unmindful of "overtime." Does the present statute, or the construction thereof by our courts,

exclude "overtime," irrespective of the terms of the contract of hiring or customary number of working hours constituting an ordinary working day, from all calculations in determining the weekly wage?

In *Smolenski* v. *Eastern Coal Dock Co., supra,* decided in 1914 and while the 1913 amendment was in effect, the court stated: "We think it may fairly be held that the legislature meant that the daily wages should be taken to be what would be earned by working for the ordinary number of working hours, and that the employee was not to lose by reason of enforced idleness during some of those hours, nor to gain because on some days he worked overtime." It is apparent from a careful reading of this opinion that "those hours," during which an employee was not to lose because of enforced idleness, refers to hours during the customary number of working hours of an ordinary day; and that "overtime," for which an employee should not gain, refers to hours worked in excess of the customary number of working hours of an ordinary day. There is no provision in the statute which prohibits the increasing of the money rate to be received as recompense for services rendered during any of the customary hours of an ordinary day. The only limitation upon "money rate" is that fixed by the contract of hiring. If the court had intended "overtime" to mean rate of pay in excess of a fixed rate for a given number of hours—overtime rate or pay—would it not have so stated, particularly in view of its declaration that wages should be taken to be what was "earned" by working the customary number of hours. I do not interpret this opinion of the court to automatically exclude all overtime from the calculation of weekly wage, irrespective of the money rate fixed by the contract of hiring or the customary number of working hours constituting an ordinary day. To hold otherwise would be imposing a restriction upon a contract of hiring by limiting the *quantum* of "money rate," and be repugnant to a liberal construction of the statute.

A careful consideration of the above-mentioned opinion as well as numerous other decisions which I have reviewed, leads me to the conclusion that overtime, when referring to a mathematical formula for computing the wage rate to be

received as recompense for any part of the customary number of working hours constituting an ordinary day in accordance with and pursuant to a contract of hiring, constitutes wages "earned" within the meaning of the statute for the purpose of calculating the rate of compensation.

Even though the rate of compensation paid to the petitioner was calculated upon weekly wages including a bonus of 10%, the respondent suggests that there is considerable doubt as to whether the bonus should be included in such calculation. I believe that it should. The testimony is clear and undisputed that the petitioner was hired to work 12 hours per day, which was the customary number of working hours constituting an ordinary day of the entire plant, for 5 days a week, for which he was to be recompensed at the rate of 37½ cents per hour for the first 8 hours of each day and at the rate of 56¼ cents per hour for all time over 8 hours per day, and in addition was to receive a bonus of 10% of such hourly wage rate earnings. This constituted the contract of hiring. The term "bonus" in this case is a misnomer. It was included in the contract of hiring and is just as much a part and parcel of the contract as the hourly wage rates. It was paid regularly to the petitioner and to all other employees. To all intents and purposes it is an additional hourly wage rate, although the reason for expressing it by the term of "bonus" is not disclosed. It was certainly not a gratuity within the meaning of the statute. I, therefore, find that the weekly wages of the petitioner upon which the rate of compensation is to be calculated is $28.88, and the rate of compensation computed thereon is $19.25.

As to medical expenses, I find that the treatment rendered by Dr. Millard F. Sewall from January 2d, 1943, to January 21st, 1943, for burns on the right arm was necessary and that the charges therefor in the sum of $15 are reasonable. The respondent is directed to pay the same. It was stipulated that all other medical expenses and hospital costs incurred in the treatment of the petitioner have been paid by the respondent.

The petitioner is directed to pay to Dr. Henry L. Drezner the sum of $25 for two physical examinations and making report in preparation of trial, and to Dr. Samuel Hirschberg the sum of $25 for neurological examination and making

report in preparation of trial, and to Dr. Max Kummel the sum of $25 for physical examination and making report in preparation of trial. The respondent is directed to pay the sum of $50 to Dr. Henry L. Drezner for his services in appearing in court and giving testimony in these proceedings, and to pay the sum of $50 to Dr. Samuel Hirschberg for his services. Rothbard, Greenstone & Harris, Esqs., attorneys for petitioner, are hereby allowed a counsel fee of $625, of which the respondent is directed to pay the sum of $375 and the petitioner the sum of $250.

It is, therefore, on this 11th day of February, 1944, ordered, that judgment be entered in favor of the petitioner, Harold Simpkins, and against the respondent, Martin Dye & Finishing Co., and that respondent make payments as follows:

For temporary disability, compensation from May 9th, 1941, to and including October 15th, 1942, a period of 75 weeks, and from January 2d, 1943, to and including January 21st, 1943, a period of 2 6/7 weeks, totaling 77 6/7 weeks, at the compensation rate of $19.25 per week, the respondent to be credited with the amount heretofore paid on account of temporary disability.

For total permanent disability, compensation for 400 weeks, from October 16th, 1942, to January 1st, 1943, inclusive, and from January 22d, 1943, to July 5th, 1950, inclusive, at the compensation rate of $19.25 per week; said payments to continue after July 5th, 1950, the expiration of said 400 weeks, at the same rate, in accordance with the provisions of section 12, subd. (b), title 34, chapter 15, Revised Statutes of New Jersey, 1937; N. J. S. A. 34:15–12, subd. b, subject to such physical or educational rehabilitation as may be ordered by the Rehabilitation Commission, and subject to modification of this order as provided by said statute.

\*      \*      \*      \*      \*      \*      \*

R. Wayne Kraft,
*Deputy Commissioner.*