FRANCES TRIANO, PETITIONER-APPELLANT, v. CARBON STEEL PRODUCTS CORP., RESPONDENT-APPELLEE.

Argued March 19, 1973—Decided June 19, 1973.

*Mr. Charles J. Farley, Jr.* argued the cause for the appellant (*Messrs. Haggerty & Farley*, attorneys).

*Mr. Gerald W. Conway* argued the cause for the appellee (*Messrs. Brause, Callaghan & Coyle*, attorneys).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This is a workmen's compensation death case in which the sole issue is whether regularly paid overtime wages should be included in computing the weekly wage rate upon which compensation awards are based under *N. J. S. A.* 34:15–37, 12 and 13.

George Triano died on April 10, 1968 as a result of a heart attack suffered while driving a tractor trailer truck for his employer, the respondent Carbon Steel Products Corporation. The Division of Workmen's Compensation found his death to be work-related and awarded his widow, the petitioner, 450 weeks of dependency benefits at a rate of $69.80 based on a stipulated weekly base wage of $139.60. Thereafter, the Division denied petitioner's motion to amend the judgment to increase weekly benefits to the maximum rate of $83.00 in accordance with the employer's payroll record, entered into evidence, which indicated that the decedent regularly worked overtime and received an average weekly wage approaching $200 for the 15 months prior to

his death. The Union County Court affirmed the denial of the motion. The Appellate Division found the appeal to the County Court to have been out of time and dismissed the appeal taken to the former tribunal. We granted certification and remanded the case to the Appellate Division for a determination on the merits. 60 *N. J.* 510 (1972).

Thereupon the Appellate Division in an unreported opinion affirmed the judgment of the County Court. The court reasoned that *N. J. S. A.* 34:15–37 has been construed to refer to the customary hours generally worked by an employee in the type of operation involved, as distinguished from those worked by the particular employee, citing *Engelbretson v. American Stores,* 49 *N. J. Super.* 19 (App. Div. 1957), aff'd o. b. 26 *N. J.* 106 (1958), and that overtime has been held excludable in computing the weekly wage rate under *N. J. S. A.* 34:15–37 absent any agreement in the contract of employment that overtime is guaranteed. *Atamanik v. Real Estate Management, Inc.,* 21 *N. J. Super.* 357 (App. Div. 1952). Reliance was also placed on *Smolenski v. Eastern Coal Dock Co.,* 87 *N. J. L.* 26 (Sup. Ct. 1915), aff'd o. b. 88 *N. J. L.* 387 (E. & A. 1915). We again granted certification. 62 *N. J.* 197 (1973).

The facts are not in dispute. The decedent was the respondent's only truck driver. He delivered its products in New Jersey, New York and Pennsylvania and regularly worked in excess of 40 hours a week. In her dependency claim petition petitioner represented that the decedent ordinarily worked ten hours a day, five and a half days a week. The payroll record shows that for the first 40 hours of work per week, he received $3.34 an hour in 1967 and $3.49 an hour in 1968, and for time in excess of 40 hours per week he received a higher "overtime" hourly rate. Decedent's total earnings were $10,111.41 in 1967 and $2,511.94 in the first quarter of 1968. There is no evidence that he was "guaranteed" overtime in the contract of employment, apparently a union contract.

*N. J. S. A.* 34:15–37 provides that:

" 'Wages', when used in this chapter, shall be construed to mean the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the accident. \* \* \* When the rate of wages is fixed by the hour, the daily wage shall be found by multiplying the hourly rate by the *customary number of working hours constituting an ordinary day in the character of the work involved.* In any case the weekly wage shall be found by multiplying the daily wage by 5, or if the employee worked a greater proportion of the week regularly, then by 5½, 6, 6½ or 7, according to the customary number of working days constituting an ordinary week in the character of the work involved. \* \* \*." (Emphasis added.)

■ The obvious purpose of the statute is to arrive at a realistic estimate of the worker's true weekly earning potential so that the benefits calculable thereon may fairly relate to the worker's loss attributable to the accident or death, subject to the statutory percentage limitations. See *Maver v. Dwelling Managers Co.*, 34 *N. J.* 440, 443 (1961).

■ Considering the particular problem, for the moment, independently of existing case authority, it would seem evident, especially in the light of settled rules enjoining construction of the Workmen's Compensation Act liberally in favor of workmen, that so-called "overtime" should not be excluded in computing the wage base rate in a case where, as here, the term simply signifies a component of the method of calculation of the worker's pay and has no necessary relationhip to the customary work period experienced by the employee. An accommodation of the strict statutory language appears to be called for to meet the intrinsic sense of the act in a case where there is not a single hourly rate for all the hours customarily worked, but rather a "base rate" for a fixed number of those hours and an "overtime" rate for the remainder. In such a case — the present one — the intent of the act is subserved by averaging on a weekly basis the actual earnings customarily accruing to the employee over a reasonably substantial period of time prior to the accident and taking that average as the "weekly wage" for purposes

of *N. J. S. A.* 34:15–37. In effect, only the first sentence of the section is operative in that situation.

There is nothing in the history of the act or in our prior holdings in this field that militates against the foregoing conclusion.

The original act did not define how wages were to be computed, simply providing that the amount of benefit should be determined by a given percentage of the wages received at the time of injury or death. There was no mention of hourly rate. *L.* 1911, *c.* 95, §§ 11, 12.

By amendment in 1913 it was provided that for employees who were compensated on the basis of *piecework,* the weekly wages were to be six times the average daily earnings "for a working day of ordinary length, excluding overtime". *L.* 1913, *c.* 174, § 8. Although the law still did not expressly exclude overtime for workers paid by the hour, nevertheless in *Smolenski v. Eastern Coal Dock Co., supra,* the court pointed to the express exclusion of overtime for piecework to suggest that. overtime hours should also be excluded for workers paid on a time basis. The court continued:

"* * * We think it may fairly be held that the Legislature meant that the daily wages should be taken to be what would be earned by working for the ordinary number of hours, and that the employe was not to lose by reason of enforced idleness during some of those hours, nor to gain because on some days he worked overtime.

"Wages, the Legislature said, must be construed to be the money rate at which the services were recompensed. What is to be considered is not the recompense in fact received, but the rate which the contract of hiring fixed, whether that rate was in fact realized for the whole time or not.* * *." 87 *N. J. L.* at 28.

It may be significant that while the worker in *Smolenski* had apparently worked some hours at an overtime rate, his actual earnings in the approximately six months before his death were below the amount which would have been produed by multiplying his hourly rate at the time of injury by the ordinary number of hours in the employment. Thus the use by the court of the hourly rate at which the em-

ployce was being paid did not operate to restrict the amount of benefits, but permitted the employee's survivor to receive larger benefits than if actual earnings, including overtime, were used to calculate the wage.

In 1919 the act was amended to incorporate the present statutory language and to omit the express exclusion of overtime for piecework. *L.* 1919, *c.* 93, § 9. Nevertheless, in *Mannino v. Davis Baking Powder Co.,* 5 *N. J. Misc.* 740, 742 (Dept. Labor 1927), the Deputy Commissioner suggested that the 1919 amendment was "based on the Smolenski case", and indicated legislative approval of its language. The bureau accordingly followed *Smolenski,* and refused to consider overtime in the computation of death benefits paid to the survivor of an employee who was "given all possible opportunity at overtime", although the commissioner's opinion failed to specify whether the employee in fact regularly worked a substantial number of overtime hours. 5 *N. J. Misc.* at 741.

This Court has never before been presented with a case under the present statutory language which on its facts dealt with the exclusion of regularly paid overtime compensation from the computation of weekly earnings for compensation benefits. We recognize that this Court, in affirming, adopted the opinion of the Appellate Division in *Engelbretson v. American Stores, supra,* where it was ·said:

"Under the circumstances, we hold the view * * * that in establishing the basis for computing the daily wages for an employee hired at an hourly rate of pay, the allusion to the 'customary number of working hours constituting an *ordinary* day in the *character of the work involved*' has reference to the regular or normal working day followed by the employer in the line or type of work in which the particular employee is engaged. *Cf. Ostatnik v. Hamilton,* 43 *N. J. Super.* 469 (Cty. Ct. 1957). Conversely, in our opinion the reference is not to the number of hours in a day the employee is called upon to work under his contract — unless the type of occupation is such that a lesser number of hours than eight are customary or perhaps necessary because of its nature. * * *." (Emphasis by the Appellate Division.) 49 *N. J. Super.* at 26.

However, the facts in *Engelbretson* did not involve over-time, but concerned the computation of wages for a part-time employee who usually worked two days per week for four hours a day. In permitting the employee's wages to be ascertained by the normal work schedule followed by the employer rather than the particular number of hours worked by the individual employee, the court stressed the particular problems faced by the part-time employee, noting that "the ordinary part-time worker today may have full-time employment tomorrow or that a part-time worker (such as a daily houseworker) may have four or five such jobs each week", and that an accident suffered in one employment would prevent or interfere with later full-time employment or with other concurrent part-time jobs. 49 *N. J. Super.* at 25. See also *Maver v. Dwelling Managers Co., supra,* and *Knight v. Cohen,* 32 *N. J.* 497 (1960), where the *Engelbretson* rationale was approved in situations involving part-time employees. The *Engelbretson* court also stressed the remedial purposes of workmen's compensation legislation and the tradition of liberal judicial construction in order to provide workers with maximum possible protection. 49 *N. J. Super.* at 25.

As noted above, the Appellate Division also relied on *Atamanik v. Real Estate Management, Inc., supra.* The principal issue there was whether a statement made by the decedent concerning the cause of his injury was admissible as part of the *res gestae.* However, at another point in the opinion the court rejected the contention that the decedent's overtime should have been considered in determining the base pay. Without revealing the regularity or the amount of the overtime claimed, the court observed:

"* * * There is absent any testimony that in addition to the base pay of $22 per week there was any agreement that overtime was guaranteed. The Hudson County Court therefore properly computed the amount awarded for temporary disability, and its judgment is in this respect affirmed." 21 *N. J. Super.* at 365.

But we think there is no reason in policy or relevant to the apparent legislative intent to require a guarantee of overtime as a condition of its use in computing wages where in fact the employee is regularly and customarily working overtime.

An instructive agency ruling in this area is *Simpkins v. Martin Dye & Finishing Co.,* 22 *N. J. Misc.* 230, 36 *A.* 2d 611 (Dept. Labor 1944). There the employee at the time of hiring was told that the plant worked on two 12-hour shifts, and that he was to work 12 hours per day 5 or 6 days a week. His pay was 37½ cents per hour for 8 hours a day, 40 hours per week, and overtime at 56¼ cents per hour for additional hours. The deputy commissioner rejected the employer's argument, based on *Smolenski, supra,* that compensation benefits should be limited to the base pay of 37½ cents per hour for a 40-hour week. He said:

"* * * There is no provision in the statute which prohibits the increasing of the money rate to be received as recompense for services rendered during any of the customary hours of an ordinary day. The only limitation upon 'money rate' is that fixed by the contract of hiring. If the court [in *Smolenski*] had intended [excludable] 'overtime' to mean rate of pay in excess of a fixed rate for a given number of hours — overtime rate or pay — would it not have so stated, particularly in view of its declaration that wages should be taken to be what was 'earned' by working the customary number of hours. I do not interpret this opinion of the court to automatically exclude all overtime from the calculation of weekly wage, irrespective of the money rate fixed by the contract of hiring or the customary number of working hours constituting an ordinary day. To hold otherwise would be imposing a restriction upon a contract of hiring by limiting the *quantum* of 'money rate', and be repugnant to a liberal construction of the statute.

A careful consideration of the above-mentioned opinion as well as numerous other decisions which I have reviewed, leads me to the conclusion that overtime, when referring to a mathematical formula for computing the wage rate to be received as recompense for any part of the customary number of working hours constituting an ordinary day in accordance with and pursuant to a contract of hiring, constitutes wages 'earned' within the meaning of the statute for the purpose of calculating the rate of compensation." 22 *N. J. Misc.* at 236–237.

We are essentially in accord with the reasoning of Deputy Commissioner Kraft as thus expressed.

While the respondent here argues that *Simpkins* falls within the exception recognized in *Atamanik, supra,* for overtime which is "guaranteed" in the employment contract, we reject the distinction since, as indicated above, we regard the factor of guarantee as irrelevant.

Respondent argues that *Engelbretson, supra,* requires the use of a customary full-time day for the trucking industry in general rather than the particular requirements of the decedent's employer. We disagree. We see no reason why the "customary" full-time day should not be taken to be that customarily in effect as between the particular employer and employee. This is the realistic criterion which comports with the essential purpose of the act to provide due compensation to the worker for *his* loss attributable to the accident. We have analyzed *Engelbretson* above. That case, dealing, as already noted, with the special situation and problems of part-time workers, cannot be taken to substantiate an inflexible rule that the actual number of hours worked in a particular job is necessarily irrelevant to the determination under *N. J. S. A.* 34:15–37 of the "customary number of working hours constituting an ordinary day in the character of the work involved." The peculiar necessity to construct a model work day and week different from actuality in the case of a part-time worker does not exist when dealing with one working full-time. In the present case, involving a full-time workman, where it is established that the customary work schedule in effect at the time of the accident included hours which were required to be paid at an overtime rate, total compensation for all hours worked must be taken into account.

While decisions in other jurisdictions are sometimes peculiarly dependent on the particular statutory language, the strong trend is to take into consideration overtime compensation shown to be a normal and regular characteristic of the worker's earnings. See, *e. g., Field v. Industrial Com-*

*mission,* 73 *Ariz.* 133, 238 *P.* 2d 953, 956–957 (Sup. Ct. 1951); *Shortall v. Brown & Sharpe Mfg. Co.,* 74 *R. I.* 237, 60 *A.* 2d 143 (Sup. Ct. 1948); *National Pressure Cooker Co. v. Industrial Com'n,* 249 *Wis.* 381, 24 *N. W.* 2d 697 (Sup. Ct. 1946); *Tate v. Gullett Gin Company & Liberty Mutual Ins. Co.,* 86 *So.* 2d 698, 704 (La. Ct. App. 1956); *Carrington v. Consolidated Underwriters,* 230 *La.* 939, 89 *So.* 2d 399, 403 (Sup. Ct. 1956). See also 2 *Larson, The Law of Workmen's Compensation* (1970) §§ 60.11, 60.12, where the author argues generally against rigid rules in determining what is to be included in wages used to calculate benefits, and states: "The entire objective of wage calculation is to arrive at a fair approximation of claimant's probable future earning capacity." *Id.* at § 60.11, p. 88.189.

The judgment is reversed and the cause remanded to the Division of Workmen's Compensation for amendment of the award conformably with this opinion.

*For reversal and remandment*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL, MOUNTAIN and SULLIVAN, and Judge CONFORD—7.

*For affirmance*—None.